No. 23-3392

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

ILIA KOLOMINSKY; BRYAN ANDERSON,

*Plaintiffs*,

– and –

PLUMBERS LOCAL 290 PENSION TRUST FUND, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiff-Appellant*

vs.

ROOT, INC.; ALEXANDER TIMM; DANIEL ROSENTHAL; MEGAN
BINKLEY; CHRISTOPHER OLSEN; DOUG ULMAN; ELLIOT GEIDT; JERRI
DEVARD; LARRY HILSHEIMER; LUIS VON AHN; NANCY KRAMER;
NICK SHALEK; SCOTT MAW; BARCLAYS CAPITAL INC.; GOLDMAN
SACHS & COMPANY, LLC; MORGAN STANLEY & COMPANY, LLC;
WELLS FARGO SECURITIES, LLC,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Ohio
No. 2:21-cv-01197-MHW-CMV
The Honorable Michael H. Watson

## PLAINTIFF-APPELLANT'S OPENING BRIEF

ROBBINS GELLER RUDMAN
 & DOWD LLP
STEVEN F. HUBACHEK
JONAH H. GOLDSTEIN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
 & DOWD LLP
MICHAEL G. CAPECI
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Attorneys for Plaintiff-Appellant*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-3392                    Case Name: Ilia Kolominsky, et al. v. Root, Inc., et al.

Name of counsel:  Steven F. Hubachek

Pursuant to 6th Cir. R. 26.1, Plumbers Local #290 Pension Trust Fund
*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on _____July 12, 2023_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Steven F. Hubachek

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

**Page**

I.    ORAL ARGUMENT STATEMENT ................................................................1

II.   JURISDICTION ..........................................................................................................1

III.  ISSUES PRESENTED ................................................................................................2

IV.  STATEMENT OF THE CASE ................................................................................3

      A.    Statement of Facts .......................................................................................3

            1.     Introduction ....................................................................................3

            2.     The IPO ...........................................................................................6

            3.     Root's business model. ...............................................................7

            4.     Root's crucial CAC metric...........................................................8

            5.     Defendants' misleading statements and omissions in the Registration Statement conveyed to the reasonable investor that, as of the time of the IPO, Root enjoyed a competitive advantage due to its low CAC. .............................10

            6.     Timm's roadshow statements. ..................................................12

            7.     Developments following the IPO reveal that Defendants' statements and omissions were misleading. .............................13

      B.    Course of Proceedings..............................................................................18

      C.    The Ruling Presented for Review .......................................................18

V.    SUMMARY OF ARGUMENT................................................................................22

VI.  ARGUMENT................................................................................................................28

      A.    Standard of Review ....................................................................................28

**Page**

B.  The Complaint Adequately Alleges False and Misleading
    Statements and Omissions under §§11 and 12(a)(2) ..........................29

    1.  The applicable statutes. ...........................................................29

    2.  The district court erred in applying Rule 9(b) to the
        Complaint's strict-liability and negligence claims under
        §§11, 12(a)(2), and 15................................................................33

    3.  Defendants' statement that its mobile-directed customer-
        acquisition strategy was "delivering customer acquisition
        costs below the average cost of doing so" was false and
        misleading because it was not doing so at the time of the
        IPO. ...............................................................................................42

        a.  The statement was false and misleading. ......................42

        b.  Having raised the issue of their CAC, Defendants
            failed "to speak fully and truthfully" about it by
            not disclosing that as of the IPO Root's CAC was
            actually no different from the typical insurer's
            CAC. .................................................................................45

            (1)  The misleading omission......................................45

            (2)  The district court's omissions analysis is
                 mistaken................................................................47

    4.  Defendants' present-tense statement that Root's "strategy
        has resulted in a cost of acquisition advantage" was false
        and misleading at the time. ........................................................59

        a.  The statement was false when made. ...........................59

        b.  The statement is misleading because Defendants
            omitted the fact that there was no CAC advantage
            as of the date of the IPO. ...............................................63

- ii -

**Page**

       5.     Because the risk had already materialized, Root's CAC risk warning was misleading and actionable. ...........................65

    C.    The District Court Erred in Dismissing the §15 Claim.......................70

VII.   CONCLUSION................................................................................70

4862-7670-6927.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Basic, Inc. v. Levinson,*
   485 U.S. 224 (1988)......................................................................49

*Benzon v. Morgan Stanley Distribs.,*
   420 F.3d 598 (6th Cir. 2005) .......................................................29

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.,*
   399 F.3d 651 (6th Cir. 2005) ...................................................*passim*

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
   752 F.3d 173 (2d Cir. 2014) .........................................................32

*Dirks v. SEC,*
   463 U.S. 646 (1983)......................................................................51

*Ernst & Ernst v. Hochfelder,*
   425 U.S. 185 (1976)......................................................................29

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.,*
   873 F.3d 85 (2d Cir. 2017) ...........................................................55

*FindWhat Inv. Grp. v. FindWhat.com,*
   658 F.3d 1282 (11th Cir. 2011) ....................................................65

*Frank v. Dana Corp.,*
   547 F.3d 564 (6th Cir. 2008) .......................................................42

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.,*
   268 F. Supp. 3d 526 (S.D.N.Y. 2017) ...........................................35

*Helwig v. Vencor, Inc.,*
   251 F.3d 540 (6th Cir. 2001) (en banc), *overruled in part on other grounds by Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308 (2007) .................................................................................*passim*

4862-7670-6927.v1

**Page**

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) .........................................................................30

*Hoehl Fam. Found. v. Roberts*,
   2020 U.S. Dist. LEXIS 258005 (D. Vt. Oct. 15, 2020) ................................37, 38

*Hurwitz v. LRR Energy, L.P.*,
   241 F. Supp. 3d 491 (D. Del. 2017) ....................................................66

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021), *cert. denied sub nom.*
   *Alphabet Inc. v. Rhode Island*, 142 S. Ct. 1227 (2022) ...................28, 31, 65, 69

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013) .........................................66, 69

*In re FirstEnergy Corp. Sec. Litig.*,
   316 F. Supp. 2d 581 (N.D. Ohio 2004) ...............................................33

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
   791 F.3d 90 (D.C. Cir. 2015) .............................................................68

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) ..............................................................29

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ............................................................49

*In re ProShares Tr. Sec. Litig.*,
   728 F.3d 96 (2d Cir. 2013) ...............................................................31

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...........................................35, 37, 38

*In re Regions Morgan Keegan Sec., Derivative, & ERISA Litig.*,
   743 F. Supp. 2d 744 (W.D. Tenn. 2010) ...........................................41

**Page**

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006) ...................................................................*passim*

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005) ..............................................66

*In re Westinghouse Sec. Litig.*,
  90 F.3d 696 (3d Cir. 1996) ................................................................65

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008) ......................................................31, 66

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.*,
  583 F.3d 935 (6th Cir. 2009) ................................................33, 34, 41

*Ind. State Dist. Council v. Omnicare, Inc.*,
  719 F.3d 498 (6th Cir. 2013), *vacated*,
  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ..........................................................................40

*J&R Mktg. v. GMC*,
  549 F.3d 384 (6th Cir. 2008) ...................................................*passim*

*Kleinman v. Elan Corp., plc*
  706 F.3d 145, 153 (2d Cir. 2013) .....................................................32

*Levy v. Young Adult Inst., Inc.*,
  103 F. Supp. 3d 426 (S.D.N.Y. 2015) ........................................37, 38

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) .......................................................49, 57

*Meyer v. JinkoSolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014) ................................................31, 59, 67

*Morse v. McWhorter*,
  290 F.3d 795 (6th Cir. 2002) ............................................................30

**Page**

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
    709 F.3d 109 (2d Cir. 2013) .........................................................53, 54

*Nayani v. Lifestance Health Grp., Inc.*,
    2023 U.S. Dist. LEXIS 78411 (S.D.N.Y. May 4, 2023) ...................................35

*New Jersey v. Sprint Corp.*,
    531 F. Supp. 2d 1273 (D. Kan. 2008)..................................................39

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)....................................................*passim*

*P. Stolz Fam. P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004) ...............................................68

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ...............................................*passim*

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ...............................................*passim*

*SEC v. Reyes*,
    491 F. Supp. 2d 906 (N.D. Cal. 2007)...................................58

*Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*,
    781 F.3d 1003 (8th Cir. 2015) .............................................33, 38, 41

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*,
    2022 U.S. Dist. LEXIS 59854 (W.D. Tenn. Mar. 31, 2022)..........................65

*TSC Indus. v. Northway*,
    426 U.S. 438 (1976)....................................................49

*United States v. Barton*,
    100 F.3d 43 (6th Cir. 1996) ...............................................27, 59

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011) ...............................................68

- vii -

Page

*Woori Bank v. RBS Sec., Inc.*,
   910 F. Supp. 2d 697 (S.D.N.Y. 2012) ..................................................39

*Zeid v. Kimberley*,
   930 F. Supp. 431 (N.D. Cal. 1996)............................................21, 69

*Zwick Partners, LP v. Quorum Health Corp.*,
   2018 U.S. Dist. LEXIS 97942 (M.D. Tenn. Apr. 19, 2018) .............................65

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §77a ...............................................................................1
   §77k .........................................................................*passim*
   §77k(a) ......................................................................*passim*
   §77l(a)(2) ...................................................................*passim*
   §77o .........................................................................*passim*
   §77q(a) ...........................................................................1
   §77v ..............................................................................1
   §78j(b) ..........................................................................41

28 U.S.C.
   §1291 .............................................................................1
   §1331 .............................................................................1

Federal Rules of Civil Procedure
   Rule 8(a)......................................................................33, 35
   Rule 8(a)(2) .....................................................................33
   Rule 9(b) ...................................................................*passim*
   Rule 12(b)(6) ....................................................................28

Sixth Circuit Rules
   Rule 28(b)(1)(B) ..................................................................1
   Rule 34(a).........................................................................1

## I.    ORAL ARGUMENT STATEMENT

This is an appeal from a complicated, fact-intensive securities-fraud class action presenting complex legal issues.  As such, Lead Plaintiff-Appellant Plumbers Local 290 Pension Trust Fund ("Plaintiff") believes the Court would benefit from hearing from both sides at oral argument.  *See* 6 Cir. R. 28(b)(1)(B), 34(a).

## II.    JURISDICTION

This case arises under the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §77a *et seq.*, asserting claims under Securities Act §§11, 12(a)(2), and 15, 15 U.S.C. §§77k, 77l(a)(2), 77o.  The district court had jurisdiction under Securities Act §22(a), 15 U.S.C. §77v, and under 28 U.S.C. §1331.

On March 31, 2023, the district court entered its Opinion and Order ("Order") dismissing the Amended Complaint for Violations of the Federal Securities Laws ("Complaint") and entered judgment that same day.[1]

Plaintiff filed a timely notice of appeal on April 28, 2023.[2]

This Court has jurisdiction under 28 U.S.C. §1291.

---

[1]    Order(RE64)PAGEID#1305-1353; Judgment(RE65)PAGEID#1354

[2]    Notice of Appeal(RE66)PAGEID#1355-1356

- 1 -

## III.   ISSUES PRESENTED

A.     Whether the district court erred in applying the heightened fraud-pleading standards of Fed. R. Civ. P. 9(b) to the only claims at issue in this appeal—Plaintiff's claims under §§11, 12(a)(2), and 15—all of which allege strict liability and negligence, not fraud.

B.     Whether Defendants' statement in the Registration Statement that Root had "designed a mobile-directed customer acquisition strategy, delivering customer acquisition costs below the average cost of doing so" was false and misleading because Defendants' strategy was not delivering below-average costs when they spoke and Defendants did not disclose that fact in the Registration Statement.

C.     Whether Defendants' statement in the Registration Statement that "[t]he efficiency of [Root's] customer acquisition strategy has resulted in a cost of acquisition advantage versus direct and agent channels" was false and misleading because Defendants' strategy was not delivering below-average customer-acquisition costs when they spoke and Defendants did not disclose that fact in the Registration Statement.

D.     Whether Defendants' purported warning in the Registration Statement that "[a]s we grow, we may struggle to maintain cost-effective marketing strategies, and our customer acquisition costs could rise substantially" was false and misleading

- 2 -

because when they spoke Root was not maintaining cost-effective marketing strategies and its cost of customer-acquisition had already risen substantially such that Root's cost of acquisition was no better than the average insurer's and Defendants did not disclose these facts in the Registration Statement.

E.    Whether it was error to dismiss the §15 claim for lack of a primary violation given that it was error to dismiss the §§11 and 12(a)(2) claims.

## IV.    STATEMENT OF THE CASE

### A.    Statement of Facts

#### 1.    Introduction

This appeal is from the dismissal of securities class-action claims alleging strict liability and negligence under §§11, 12(a)(2), and 15 of the Securities Act,[3] and concerns Defendants' materially false and misleading statements and omissions made in connection with Root's Initial Public Offering ("IPO") regarding one of Root's most-critical financial metrics, customer-acquisition cost ("CAC"),[4] in Root's Registration Statement.[5]

---

[3]    These claims do not allege fraud.    Complaint(RE31)PAGEID#758, 760, 763(¶¶154, 165, 178)

[4]    Complaint(RE31)PAGEID#725(¶6)

[5]    "Defendants" refers collectively to Root, Inc. ("Root"); Root's CEO Alexander Timm, Root's CFO Daniel Rosenthal, Megan Binkley, Christopher Olsen, Doug

- 3 -

Root is a start-up automotive-insurance company that seeks to differentiate itself from traditional insurers by focusing on reaching customers through a mobile app.[6] The IPO was a key part of Root's strategy to raise money to support Root's expansion from being a regional insurer to having nationwide availability.[7] To complete this strategy, Defendants marketed Root's purportedly low CAC, thus conveying to investors that Root was able to acquire new customers more profitably than traditional insurers.[8] In short, because Root's average CAC was $332 for the two years preceding the IPO—well below the range of $500 to $800 CAC figures of traditional insurers—Defendants repeatedly told investors in its offering documents that Root had a CAC "advantage."[9]

---

Ulman, Elliot Geidt, Jerri DeVard, Larry Hilsheimer, Luis von Ahn, Nancy Kramer, Nick Shalek, Scott Maw (the "Individual Defendants"); and Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., and Wells Fargo Securities, LLC (the "Underwriter Defendants"). "Registration Statement" refers to the prospectus and Form S-1 registration statement, as amended, issued in connection with Root's initial public offering on or about October 28, 2020. Complaint(RE31)PAGEID#724(¶2)

[6]     Complaint(RE31)PAGEID#725(¶4)

[7]     Complaint(RE31)PAGEID#725-726, 740(¶¶5, 9, 89)

[8]     Complaint(RE31)PAGEID#726, 734, 737-739, 744-745(¶¶8, 48, 73-81, 106)

[9]     Complaint(RE31)PAGEID#744-745(¶106)

- 4 -

But as of Root's IPO on or about October 28, 2020, it didn't.[10]  Rather, Root's actual CAC as of the IPO was effectively no different than the costs incurred by typical insurers and would spike even higher thereafter, yet Defendants did not disclose those crucial facts in the Registration Statement.[11]    Nonetheless, Defendants—having priced Root Class A common stock at $27.00 per share— conducted the IPO, reaping over $600 million in net proceeds for Root and achieving a valuation of approximately $6.7 billion.  Almost immediately after the IPO, the market learned that Root's CAC *as of the date of the IPO itself* had already risen to a level at or above those of traditional automobile insurers, and similarly devastating disclosures were made in connection with Root's earnings reports in December 2020, February 2021, and August 2021.[12]    On March 19, 2021, when the initial complaint in this action was filed, Root Class A common stock closed at $12.00 per

---

[10]  Complaint(RE31)PAGEID#740-741(¶¶90-93)  The Class Period began October 28, 2020 and continued through August 12, 2021, inclusive. Complaint(RE31)PAGEID#724(¶1)

[11]  Complaint(RE31)PAGEID#725-726, 739, 741-742, 752-755(¶¶7, 80, 94-95, 131-135)

[12]  Complaint(RE31)PAGEID#727-728(¶¶15-16)

4862-7670-6927.v1

share, an approximate 55.5% decline from the IPO price.[13]  Root Class A common stock subsequently closed under $4.50 per share on November 18, 2021.[14]

### 2. The IPO

The IPO was conducted on or about October 28, 2020 to: (i) raise capital for Root from public investors (like Plaintiff); and (ii) provide liquidity for the Root securities owned by Root's pre-IPO venture capitalists, SVB Financial Group ("SVB") and DRD Contact, LLC ("DRD," and with SVB, the "Selling Stockholders").[15]  The SEC declared Root's Registration Statement effective on October 27, 2020.[16]

Of the 26,830,845 shares of Root Class A common stock sold in the IPO, Root offered 24,249,330 shares at $27.00 per share, generating approximately $618.7 million in net proceeds.[17]  The Selling Stockholders offered the remaining 2,581,515 shares at $27.00 per share, generating approximately $65.8 million in net proceeds.[18]

---

[13]  Complaint(RE31)PAGEID#728(¶17)

[14]  Complaint(RE31)PAGEID#728(¶17)

[15]  Complaint(RE31)PAGEID#724, 733-734(¶¶1-2, 41, 51)

[16]  Complaint(RE31)PAGEID#735(¶57)

[17]  Complaint(RE31)PAGEID#735-737(¶¶58-59, 64, 72)

[18]  Complaint(RE31)PAGEID#735-737(¶¶58-59, 64, 72)

In the weeks leading up to the IPO, both the IPO's offering price (a range between $22.00 and $25.00 per share as of October 20, 2020) and size (24,164,515 shares as of October 20, 2020) substantially increased.[19]  Post-IPO, the Underwriter Defendants declined to exercise their option to purchase 4,024,626 additional shares of Root Class A common stock at the IPO price.[20]

### 3.    Root's business model.

Root is a technology company claiming to be revolutionizing automobile insurance through a pricing model based upon data, referred to as telematics, harvested from an app downloaded by customers onto their mobile phones.[21]  That data can then be analyzed to identify the riskiest 10% to 15% of drivers.[22]  Root's business model is to offer its automotive-insurance products to drivers outside of the 10-15% risk zone, thus enabling it to offer—through its mobile app—a lower price compared to traditional insurance companies while also reducing insurance claims.[23]

---

[19]   Complaint(RE31)PAGEID#735(¶¶55-59)

[20]   Complaint(RE31)PAGEID#736-737(¶¶66-68)

[21]   Complaint(RE31)PAGEID#733-734(¶¶45-47)

[22]   Complaint(RE31)PAGEID#733(¶46)

[23]   Complaint(RE31)PAGEID#733(¶46)

4862-7670-6927.v1

Root explained that most traditional insurance companies employ pooled-risk underwriting and rely upon insurance agents as their primary form of distribution, requiring payment of expensive commissions that reduce the profitability of automotive insurance.[24]  Root believes its near-exclusive reliance on mobile phones and telematics comprises a competitive advantage, which the Registration Statement claims has not been meaningfully adopted by traditional insurance companies.[25]

As of the IPO, Root was licensed to sell insurance in 36 states, was then selling insurance in 30 states, and planned to expand nationwide by early 2021.[26]

### 4.    Root's crucial CAC metric.

CAC reflects the average cost of acquiring a new customer, calculated by dividing the sales and marketing expense for a given period by the new customers acquired during that time.[27]  CAC is a critical financial metric for new companies because it indicates how well they can improve profitability as they grow.[28]

---

[24]  Complaint(RE31)PAGEID#733-734(¶¶45, 48)

[25]  Complaint(RE31)PAGEID#734(¶48)

[26]  Complaint(RE31)PAGEID#734(¶¶49-50)

[27]  Complaint(RE31)PAGEID#737-738(¶¶73-74)

[28]  Complaint(RE31)PAGEID#738(¶75)

Root recognizes the metric's significance, identifying it as one of Root's four "principal profitability levers."[29]  The Registration Statement emphasizes the importance of CAC to Root's profits, pointing out that Root's average CAC of $332 during the period of August 2018 to August 2020 was well below the typical CAC of traditional-insurance companies, which is typically $500-$800 due to intense competition.[30]  For automobile insurers that, like Root, focus on direct-to-consumer marketing—*i.e.*, GEICO and Progressive—the average CAC is approximately $700.[31]

Throughout October 2020, investors and analysts were keenly focused on Root's CAC.[32]  Indeed, multiple analyst reports emphasized Root's low average CAC of $332 and the advantage over competitors conferred by that figure.[33]

---

[29]  Complaint(RE31)PAGEID#738(¶76)

[30]  Complaint(RE31)PAGEID#738-739(¶¶77-80)

[31]  Complaint(RE31)PAGEID#739(¶80)

[32]  Complaint(RE31)PAGEID#739(¶¶81-85)

[33]  Complaint(RE31)PAGEID#739(¶¶82-85)

5.    **Defendants' misleading statements and omissions in the Registration Statement conveyed to the reasonable investor that, as of the time of the IPO, Root enjoyed a competitive advantage due to its low CAC.**

Defendants emphasized the competitive advantage conferred by Root's low average CAC throughout the Registration Statement.  For instance, the Registration Statement explained that "mobile device[s]" were "an underutilized distribution channel" that Root was well-positioned to exploit because it was "[e]ngaging [its] customers and prospective customers directly through the mobile device."[34]  Root proclaimed it had succeeded in profitably exploiting that channel despite the "historical[] … difficulty" experienced by others seeking to do the same: "Through our hyper-targeted, data-driven and ever-improving performance marketing capabilities, we have been able to acquire customers for below the average cost of doing so through each of the direct and agent-based channels."[35]

The Registration Statement continued to emphasize Root's ability to exploit the mobile-device channel, observing that it "is the fastest growing retail channel in the United States" and explaining that "[w]e therefore designed a mobile-directed

---

[34]  Complaint(RE31)PAGEID#744-745(¶106)

[35]  Complaint(RE31)PAGEID#744-745(¶106)

4862-7670-6927.v1

customer acquisition strategy, *delivering customer acquisition costs below the average cost of doing so* through each of the direct and agent channels."[36]  The Registration Statement advised investors that it had previously "designed a mobile-directed customer acquisition strategy," and that that strategy was "delivering customer acquisition costs below the average cost of doing so."[37]

The Registration Statement further explained that Root's mobile-device-based strategy had achieved the desired result—"[t]he efficiency of our customer acquisition strategy *has resulted in a cost of acquisition advantage* versus direct and agent channels."[38]  It illustrated that success by pointing out that "[w]hile our customer acquisition costs can vary by channel mix, by state or due to seasonality, over the period from August 2018 to August 2020 our average customer acquisition cost was $332."[39]

Defendants accompanied information regarding Root's successful effort to achieve a competitive advantage via its low CAC with assurances of expanded

---

[36]  Complaint(RE31)PAGEID#744-745(¶106)

[37]  Complaint(RE31)PAGEID#744-745(¶106)

[38]  Complaint(RE31)PAGEID#744-745(¶106)

[39]  Complaint(RE31)PAGEID#744-745(¶106)

- 11 -

marketing efforts.  Accordingly, Defendants promised that "[i]n the near term, as we expand our licensed footprint to 50 states, we will invest in our national brand, which will increase awareness, build credibility and support all four of our distribution channels," and that "we intend to increase our presence in digital and traditional channel media and launch a national advertising campaign to build our brand awareness."[40]

In connection with Root's growth plans, the Registration Statement included a purported warning: "As we grow, *we may* struggle to maintain cost-effective marketing strategies, and our customer acquisition *costs could* rise substantially."[41] Thus, Defendants warned of potential—not extant—negative outcomes.

### 6.    Timm's roadshow statements.

In a roadshow-sales presentation[42] preceding the IPO, Timm proclaimed that "[o]ur customer acquisition cost has maintained well below the direct average and

---

[40]  Complaint(RE31)PAGEID#744-746(¶¶106, 108)

[41]  Complaint(RE31)PAGEID#746(¶110)

[42]  The term "roadshow" refers to a sales presentation held across a series of meetings between the executives of an issuing company and potential investors. Complaint(RE31)PAGEID#741(¶92 n.2)  The roadshow enables the underwriters of an IPO and the top executives of an issuer to make a sales pitch to potential investors in the offering.  (*Id.*)  Timm and Rosenthal participated in Root's IPO roadshow and made statements to prospective investors.  (*Id.*)

4862-7670-6927.v1

so we really are more competitive."[43]  Even so, he acknowledged a "recent [CAC] spike" far in excess of the amount incurred by the average traditional insurer.[44]  He attributed the dramatically increased CAC to "experimentation on brand," stating that "we're constantly testing new marketing channels and we'll continue to do that short term."[45]  Timm also provided assurances that despite Root's "experimentation on brand" and short-term "testing [of] new marketing channels," "we believe—*and we've seen long term*—that we do have the ability to keep our customer acquisition costs much lower than our competitors."[46]

>       **7.      Developments following the IPO reveal that Defendants' statements and omissions were misleading.**

Although Root's loss of its competitive advantage in its CAC was: (i) not revealed in the Registration Statement; and (ii) misleadingly described in the roadshow, Root's increased marketing expenditures to support Root's *planned*

---

[43]  Complaint(RE31)PAGEID#750(¶124)

[44]  Complaint(RE31)PAGEID#740-741, 750-751(¶¶91-92, 124, 127)

[45]  Complaint(RE31)PAGEID#750-751(¶¶124, 127)

[46]  Complaint(RE31)PAGEID#750-751(¶¶124, 127)

- 13 -

national expansion to all fifty states—which began *before* the IPO—was the real cause of the material elevation of Root's CAC as of the IPO.[47]

Investors began to learn the truth when, in late November 2020, analysts initiated coverage of Root and painted a troubling picture of Root's present and expected future CAC, a picture that bore no resemblance to that described in the Registration Statement and at the roadshow.[48]  On November 23, 2020, a UBS analyst reported that Root's "heavy customer acquisition costs will result in elevated cash burn and net losses through 2023 requiring additional capital raises (debt and/or equity) to maintain regulatory capital requirements."[49]

The analyst further observed that Root's CAC had risen above $500 during the third fiscal quarter of 2020—which ended September 30, 2020—and was occurring prior to the IPO.[50]  A Barclays Capital Inc. analyst report—also dated November 23, 2020—similarly reported that Root's CAC reached $514 during the

---

[47]  Complaint(RE31)PAGEID#741(¶93)

[48]  Complaint(RE31)PAGEID#741-742, 752-754(¶¶94, 131-133)

[49]  Complaint(RE31)PAGEID#752-753(¶131)

[50]  Complaint(RE31)PAGEID#752-753(¶131)

third fiscal quarter of 2020, again before the IPO.[51]  Thus, as of the IPO, far from enjoying a competitive advantage, Root's CAC was already within the CAC range that was typical for the industry—although that was not publicly known—with further CAC increases virtually certain to occur given Root's commitment to "invest in [its] national brand" due to its efforts to "expand [its] licensed footprint to 50 states."[52]

Both the UBS and the Barclays analysts also projected dramatic future increases in Root's CAC.[53]  The former warned that Root's CAC was expected to be nearly $700 by the first fiscal quarter of 2021, the period ending March 31, 2021.[54]  The latter warned that one of the "risks to monitor" is that "CAC is spiking to $660+ near term on the new national TV campaign," and that "CAC is spiking up right now, weighing on profits."[55]  The Barclays analyst forecasted Root's CAC to

---

[51]  Complaint(RE31)PAGEID#741-742, 753-754(¶¶94, 133)

[52]  Complaint(RE31)PAGEID#739, 744-745(¶¶80, 106)

[53]  Complaint(RE31)PAGEID#741-742, 752-754(¶¶94-95, 131-133)

[54]  Complaint(RE31)PAGEID#752-753(¶131)

[55]  Complaint(RE31)PAGEID#741-742, 753(¶¶94, 132)

- 15 -

reach a level of "nearly $700 by 1Q21," as a result of Root's national-advertising campaign, an estimate that "could prove conservative."[56]

Then, on December 1, 2020, in Root's first financial report as a publicly-traded company, Rosenthal confirmed that Root's CAC had materially increased during the third fiscal quarter of 2020—*i.e.*, before the IPO—and would remain elevated, stating that "amplified brand spend ... will result in elevated customer acquisition cost levels *for the next two quarters*."[57]  Indeed, Rosenthal acknowledged that the elevated CAC was "in line with our [undisclosed] expectations during the quarter," thus confirming that when the IPO commenced, Defendants already expected—but did not disclose—significant CAC inflation.[58]

In Root's second financial report as a publicly-traded company, on February 25, 2021, Timm admitted that Root "still ha[s] much work to do in the quarters *and years* ahead, particularly around ... managing customer acquisition costs."[59]  A BofA

---

[56]  Complaint(RE31)PAGEID#753-754(¶133)

[57]  Complaint(RE31)PAGEID#742, 754-755(¶¶96, 134-136)

[58]  Complaint(RE31)PAGEID#754-755(¶135)

[59]  Complaint(RE31)PAGEID#742, 755(¶¶97, 137)

4862-7670-6927.v1

Securities analyst lamented Root's inflated CAC, concluding "the Root model falls short."[60]

After the market closed on August 11, 2021, Root announced a sale of a 5% ownership interest to Carvana Co. in exchange for Carvana's agreement to offer Root's insurance products to individuals who purchase vehicles through Carvana.[61] Thus, less than a year after the IPO, Carvana purchased approximately 14 million shares of Root Class A common stock for $9.00 per share, *one-third* of the $27.00 IPO price.[62]

Root's August 12 shareholder letter cited the Carvana deal as "driving scalable customer acquisition at attractive costs," but at the same time also conceded that Root was forced to substantially reduce its top-line and profitability guidance for 2021 due to the necessity "to take active steps to reduce our customer acquisition costs."[63]

---

[60]   Complaint(RE31)PAGEID#755-756(¶¶138-139)

[61]   Complaint(RE31)PAGEID#742-743, 756(¶¶98-100, 140-142)

[62]   Complaint(RE31)PAGEID#742, 756(¶¶99, 140)

[63]   Complaint(RE31)PAGEID#756(¶¶141-142)

As of the filing of this action on March 19, 2021, Root's Class A common stock traded at $12.00 per share, an approximate 55.5% decline from the IPO price of $27.00 per share.[64]  It has continued to fall, reaching $4.43 on November 18, 2021.[65]

## B.    Course of Proceedings

This action commenced on March 19, 2021.[66]  The operative Complaint was filed on November 19, 2021.[67]  Defendants moved to dismiss on May 20, 2022.[68] On March 31, 2023, the district court filed its Order dismissing the Complaint with prejudice and entered judgment that same day.[69]

## C.    The Ruling Presented for Review

The Order first concluded that the Complaint's claims alleging violations of §§11 and 12(a)(2) were subject to the heightened fraud-pleading standards of Fed.

---

[64]  Complaint(RE31)PAGEID#756(¶144)

[65]  Complaint(RE31)PAGEID#756(¶145)

[66]  Initial Complaint(RE1)PAGEID#1-34

[67]  Complaint(RE31)PAGEID#723-789; Designation of Complaint(RE54)PAGE ID#876-883

[68]  Motion to Dismiss(RE57)PAGEID#891-1185

[69]  Order(RE64)PAGEID#1305-1353; Judgment(RE65)PAGEID#1354

- 18 -

R. Civ. P. 9(b) even though those claims are based on strict liability and negligence, not fraud.[70]  Nonetheless, the district court pointed to the Complaint's allegations that "the Registration Statement contained 'materially false and misleading statements and omissions,'" and "'untrue'" statements.[71]

The district court analyzed the §§11 and 12(a)(2) claims together as they were based upon the same false and misleading statements and omissions, with the exception of Timm's roadshow comments which were alleged as only §12(a)(2) violations.[72]  The court found that none of the statements alleged in the Complaint were false or misleading.[73]

As relevant here, the court found that the Registration Statement's statement that "'[w]e therefore designed a mobile-directed customer acquisition strategy, delivering customer acquisition costs below the average cost of doing so through

---

[70]  Order(RE64)PAGEID#1314-1316

[71]  Order(RE64)PAGEID#1315-1316.  The district court also referred to allegations of a "'fraudulent scheme'" (Order(RE64)PAGEID#1316), but that allegation was made in Securities Exchange Act of 1934 ("Exchange Act") claims (Complaint(RE31)PAGEID#764-773(¶¶185-222)) not raised in this appeal, which concerns *only* Plaintiff's non-fraud Securities Act claims.

[72]  Order(RE64)PAGEID#1316

[73]  Order(RE64)PAGEID#1316-1340

4862-7670-6927.v1

each of the direct and agent channels,'" related only to "Root's past performance" and "unambiguously provides that Root '*designed*' a mobile-centric customer generating strategy that was 'delivering' CAC superior to the average CAC associated with 'direct and agent channels.'"[74]   The court did not explain how it could be true that Root's strategy "was 'delivering' [superior] CAC" at the time of the IPO when Root's CAC was already no better than the typical range for the industry.

The court also concluded that Root's statement that "[t]he efficiency of our customer acquisition strategy has resulted in a cost of acquisition advantage versus direct and agent channels" was not false or misleading as there was no duty to update what was supposedly "accurate information" even though at the time of the IPO Root enjoyed no such advantage.[75]   The court also concluded that the challenged statement was somehow "*expressly* limited to a 24-month period" because the following sentence noted that "'[w]hile our customer acquisition costs can vary by

---

[74]  Order(RE64)PAGEID#1324 (emphasis in original)

[75]  Order(RE64)PAGEID#1324-1325

4862-7670-6927.v1

channel mix, by state or due to seasonality, over the period from August 2018 to August 2020 our average customer acquisition cost was $332.'"[76]

The court also rejected the Complaint's allegation that Root's purported risk warning that "'[a]s we grow, we *may* struggle to maintain cost-effective marketing strategies, and our customer acquisition costs *could* rise substantially'" was misleading.[77]  While Plaintiff contended the statement was misleading because the risk had already materialized when Defendants spoke, the court held it "is a forward-looking statement concerning Root's future CAC," and "a prediction about Root's future."[78]  The court also relied on *Zeid v. Kimberley*, 930 F. Supp. 431, 437 (N.D. Cal. 1996), a 27-year-old district-court case that is contrary to Ninth Circuit law, *see infra* at 69, and rejected numerous other authorities because they are "out-of-circuit cases," even though the same is true of *Zeid*.[79]

The court supplemented its analysis by offering additional points specific to Plaintiff's omissions theories.  It reasoned that there was no need to disclose Root's

---

[76]  Order(RE64)PAGEID#1324-1325

[77]  Order(RE64)PAGEID#1328 (emphasis in original)

[78]  Order(RE64)PAGEID#1329

[79]  Order(RE64)PAGEID#1329-1330

4862-7670-6927.v1

elevated CAC because it truthfully set forth its performance between August 2018 and August 2020 and that the elevation was immaterial.[80] It also observed that Timm revealed the CAC increase in his roadshow comments but it did not explain why that was relevant to the Registration-Statement-based claims, and it doubled-down on its reliance on Root's purported risk warning.[81] It also speculated that Root had perhaps maintained its "a competitive advantage vis-à-vis other channels in the insurance industry."[82] Finally, the court reasoned that "Plaintiff fails to allege any facts that Root's short-term increase in CAC meant that it could not, in the long term, maintain competitively low CAC."[83]

The court dismissed the §15 control-person claim because it found there was no primary violation.[84]

## V.    SUMMARY OF ARGUMENT

The district court erred in dismissing the Complaint's claims under §§11, 12(a)(2), and 15.

---

[80]   Order(RE64)PAGEID#1337

[81]   Order(RE64)PAGEID#1337-1338

[82]   Order(RE64)PAGEID#1338

[83]   Order(RE64)PAGEID#1338 (emphasis omitted)

[84]   Order(RE64)PAGEID#1352-1353

- 22 -

First, the court erred in holding that Plaintiff's claims under §§11, 12(a)(2), and 15 were subject to the heightened fraud-pleading standard of Fed. R. Civ. P. 9(b), because those claims are expressly based on strict liability and negligence.[85] "Securities Act claims *do not sound in fraud if ordinary negligence is expressly pled in connection with those claims.*" *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 272 (3d Cir. 2006).[86]

The district court's contrary analysis is mistaken.  That court held that the Securities Act claims "sound[] in fraud"—thus making Rule 9(b) applicable—primarily because the Complaint included allegations that the Defendants' statements were "'misleading,'" "'inaccurate,'" and "'untrue,'" and that the Registration Statement contained "'materially false and misleading statements and omissions.'"[87]  But those allegations are nothing more than the generic allegations required in *every* case alleging violations of §§11 and 12(a)(2).  *See* 15 U.S.C. §77k(a); 15 U.S.C. §77l(a)(2).  Because "[f]raud is *not* an element or a requisite to a claim under Section 11 or Section 12(a)(2)," *Rombach v. Chang*, 355 F.3d 164,

---

[85]  Complaint(RE31)PAGEID#744, 747, 759, 762(¶¶105, 112, 158, 171)

[86]  Internal citations and footnotes are omitted and emphasis is added throughout unless otherwise indicated.

[87]  Order(RE64)PAGEID#1315-1316

4862-7670-6927.v1

171 (2d Cir. 2004), an analysis that mandates a finding that *every* such claim sounds in fraud cannot be right.

The district court also relied upon the Complaint's allegations that "Defendants operated a 'fraudulent scheme.'"[88]   The referenced allegations, however, relate *only* to Plaintiff's former Exchange Act claims—they are not included in the §§11, 12(a)(2), and 15 claims at issue in this appeal, none of which allege fraud.  Moreover, when claims expressly allege negligence, as here, "the fraud allegations [in a different claim] cannot be said to 'contaminate' the Section 11 and Section 12(a)(2) claims if the allegations are pled separately," *Suprema Specialties*, 438 F.3d at 272-73, also as they were here.

Second, Defendants' statement in the Registration Statement that Root "designed a mobile-directed customer acquisition strategy, *delivering customer acquisition costs below the average cost of doing so* through each of the direct and agent channels,"[89] was false and misleading because Defendants' strategy *was not delivering* below-average costs when they spoke and Defendants did not disclose

---

[88]   Order(RE64)PAGEID#1316

[89]   Complaint(RE31)PAGEID#744-745(¶106)

- 24 -

that fact in the Registration Statement.[90]  The district court's contrary analysis misses the point—it focused on the past-tense use of the term "'designed'" while ignoring the present-tense "'delivering.'"[91]  Because the strategy was not then delivering, the statement was false or at least omitted the material fact that the strategy was not presently delivering.

The district court also briefly listed several theories—applicable to all three statements challenged in this appeal—rejecting Plaintiff's omissions arguments.[92] All are erroneous.

The court held Defendants truthfully disclosed their successful *past* CAC performance from August 2018 to August 2020, but Plaintiff challenges Defendants' statements about Root's then-*present* performance.  And it is not a close question that Defendants' statements were material—a ""reasonable investor,"" *see City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005), would certainly find a dramatic increase in the crucial CAC metric to be significant, particularly in light of Root's plans for an expensive national-advertising campaign.

---

[90]  Complaint(RE31)PAGEID#726, 739, 744-745, 752-755(¶¶8, 80, 106, 131-135)

[91]  Order(RE64)PAGEID#1324 (emphasis omitted)

[92]  Order(RE64)PAGEID#1336-1339

4862-7670-6927.v1

Additionally, the district court's reliance on Defendants' supposed risk warning is misplaced—as will be demonstrated below, the warning was itself misleading because the risk had already materialized. *See infra* at 65-69. The court also speculated that perhaps Root's CAC may have somehow benefited as to other "channels" as of the IPO, but such musings are contrary to the court's duty to draw inferences in Plaintiff's favor. *See Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) (en banc), *overruled in part on other grounds by Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007). Finally, the court conjectured that perhaps Root's CAC may be favorable in the future, but that is both speculation in Defendants' favor—contrary to *Helwig*—and, regardless, no excuse for misleading investors in the present: "'"the fundamental purpose of the [Securities] Act [is] implementing a philosophy of full disclosure."'" *Bridgestone*, 399 F.3d at 668.

Third, Defendants' statement that "[t]he efficiency of [Root's] customer acquisition strategy has resulted in a cost of acquisition advantage versus direct and agent channels"[93] was false and misleading because Defendants' strategy was not delivering below-average customer-acquisition costs when they spoke and Defendants did not disclose that fact in the Registration Statement. By employing

---

[93] Complaint(RE31)PAGEID#744-745(¶106)

4862-7670-6927.v1

"the present-tense [verb] 'has,'" *see United States v. Barton*, 100 F.3d 43, 45 (6th Cir. 1996), Defendants falsely led investors to believe that Root's customer-acquisition strategy was then *presently* providing "a cost of acquisition advantage versus direct and agent channels."[94]  Alternatively, by combining present-tense claims of a then-present competitive advantage in CAC with a reference to Root's successful two-year run from August 2018 to August 2020, without also disclosing that Root's CAC no longer comprised a competitive advantage, Defendants "omitted to state a material fact … necessary to make the statements [in the Registration Statement] not misleading."  15 U.S.C. §77k(a).  The district court construed Plaintiff's argument as positing a duty to update,[95] but that doctrine does not apply as the statement was false when made.  *See Helwig*, 251 F.3d at 561 n.6.

Fourth, Defendants' purported warning that "[a]s we grow, we may struggle to maintain cost-effective marketing strategies, and our customer acquisition costs could rise substantially"[96] was false and misleading because when they spoke Root was not maintaining cost-effective marketing strategies and its CAC had already

---

[94]  Complaint(RE31)PAGEID#744-745(¶106)

[95]  Order(RE64)PAGEID#1325

[96]  Complaint(RE31)PAGEID#746(¶110)

4862-7670-6927.v1

risen so substantially that Root's CAC was no better than the average insurer's, facts that Defendants did not disclose in the Registration Statement. "'To warn that the untoward *may* occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.'" *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994). The district court's primary response is to rely on *Zeid*'s holding that is it "absurd" to suggest an investor could be misled by an inaccurate warning, *see* 930 F. Supp. at 437,[97] but post-*Zeid* Ninth Circuit authority has repeatedly rejected that view. *See, e.g.*, *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703-04 (9th Cir. 2021), *cert. denied sub nom. Alphabet Inc. v. Rhode Island*, 142 S. Ct. 1227 (2022).

Fifth, because it was error to dismiss the §§11 and 12(a)(2) claims, it was also error to dismiss the §15 claim for lack of a primary violation. *See J&R Mktg. v. GMC*, 549 F.3d 384, 398 (6th Cir. 2008).

## VI.    ARGUMENT

### A.    Standard of Review

This Court "undertake[s] a *de novo* review of the proceedings consistent with the proper [Fed. R. Civ. P.] 12(b)(6) posture of the case." *Helwig*, 251 F.3d at 553.

---

[97]  Order(RE64)PAGEID#1329

This Court "'construe[s] the complaint in a light most favorable to the plaintiff, and accept[s] all of [the] factual allegations as true. When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor.'" *Id.* (third alteration in original).

### B. The Complaint Adequately Alleges False and Misleading Statements and Omissions under §§11 and 12(a)(2)

#### 1. The applicable statutes.

Section 11 provides for liability if a registration statement, as of its effective date, contains: "(1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; [or] (3) an omission of information that is necessary to prevent existing disclosures from being misleading," *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010), that is material. *See Benzon v. Morgan Stanley Distribs.*, 420 F.3d 598, 608-09 (6th Cir. 2005). Section 11 "creates a private action for damages when a registration statement includes untrue statements of material facts or fails to state material facts necessary to make the statements therein not misleading," such that "the issuer of the securities is held absolutely liable," without regard to fault. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 207-08 (1976). Similarly, §12(a)(2) "provid[es] for liability for making a securities offering 'by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in

- 29 -

order to make the statements ... not misleading.'" *Morse v. McWhorter*, 290 F.3d 795, 798 (6th Cir. 2002). Section 15 "grounds liability of control persons on the corporation being found liable under Section 11 or 12." *J&R*, 549 F.3d at 398.

Section 11 "places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case." *Id*. "The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Id*. at 381-82. "Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Id*. at 382. "Other defendants," including the issuer's directors, underwriters, and persons who sign the registration statement, "bear the burden of demonstrating due diligence." *Id*. "Fraud is not an element or a requisite to a claim under Section 11 or Section 12(a)(2)…." *Rombach*, 355 F.3d at 171.

"[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). Indeed, this Court has long recognized that the appropriate analysis requires a determination of whether "[a] reasonable

- 30 -

juror" would "conclude that the statement … was a misrepresentation."  *See Bridgestone*, 399 F.3d at 672.

A statement is misleading if it "'affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists.'"  *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 541-42 (5th Cir. 2008); *accord Alphabet*, 1 F.4th at 700.  "The context of statements is often telling."  *See Bridgestone*, 399 F.3d at 672.  Thus, "'the proper inquiry requires an examination of defendants' representations, taken together and in context.'"  *Meyer v. JinkoSolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).  The same is true as to materiality.  *See J&R*, 549 F.3d at 395.

"[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions 'assume[s] a duty to speak fully and truthfully on those subjects.'"  *Helwig*, 251 F.3d at 561 (second alteration in original); *accord Bridgestone*, 399 F.3d at 670 ("Our securities laws ... 'require an actor to "provide complete and non-misleading information with respect to the subjects on which he undertakes to speak."'").  A ""'prospectus will violate federal securities laws if it does not disclose material objective factual matters, or buries those matters beneath information, or treats them cavalierly."'"  *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013).

- 31 -

"Congress adopted §11 to ensure that issuers 'tell[] the whole truth' to investors.  For that reason, literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Omnicare*, 575 U.S. at 192.  Accordingly, the "'veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers.'" *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013).  Statements that are literally true may become misleading based upon "'their context and manner of presentation.'" *Id.*  "'Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor[,] may properly be considered a material misrepresentation.'" *Id.* (alteration in original).

In short, Securities Act "[p]laintiffs need not allege scienter, reliance, or causation.  The standard is the same for claims pursuant to §12(a)(2), which covers prospectuses and oral communications." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 182-83 (2d Cir. 2014).  And the "liability of control persons" under §15 turns "on the corporation being found liable under Section 11 or 12." *J&R*, 549 F.3d at 398.

4862-7670-6927.v1

The three statements addressed below support liability under both §§11 and 12(a)(2), and it was error to dismiss those claims. Because it was error to dismiss those claims, it was also error to dismiss the §15 claim.

> ### 2. The district court erred in applying Rule 9(b) to the Complaint's strict-liability and negligence claims under §§11, 12(a)(2), and 15.

Because "fraud is not an element of" the alleged violations of §§11, 12(a)(2), and 15 under the Securities Act, *see Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1011-12 (8th Cir. 2015), such allegations need only satisfy the pleading standard in Fed. R. Civ. P. 8(a). Under that standard, a complaint merely requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 602 (N.D. Ohio 2004) ("Since fraud is not an element or requisite to a claim under [the Securities Act], the claims are not subject to Rule 9(b)['s] heightened pleading requirement."). The Complaint easily satisfies the Rule 8(a) standard.

The district court refused to apply Rule 8(a), however, citing this Court's holding in *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 948 (6th Cir. 2009), that when Securities Act claims "sound in fraud," Rule 9(b) is

applicable.[98]  But *Omnicare* has little in common with this case—there, this Court applied Rule 9(b) to §11 claims based on "GAAP violations [that] sound[ed] in fraud," 583 F.3d at 948, a rationale that has no application here as Plaintiff alleges no GAAP-based claims.

The district court also relied on the Second Circuit's opinion in *Rombach*, 355 F.3d at 172, in concluding that "[t]he language used in [the Complaint]—its 'wording and imputations'—is 'classically associated with fraud.'"[99]  Specifically, it pointed to allegations that "Mr. Timm's roadshow statements were 'misleading;' the Registration Statement contained 'materially false and misleading statements and omissions'; the Registration Statement was 'inaccurate and misleading' and 'untrue'; and Defendants operated a 'fraudulent scheme.'"[100]  None of these allegations justifies application of Rule 9(b).

First, the majority of the allegations cited by the district court as supposedly being "'classically associated with fraud'"[101] are strikingly similar to a list provided

---

[98]  Order(RE64)PAGEID#1315

[99]  Order(RE64)PAGEID#1315 (quoting *Rombach*, 355 F.3d at 172)

[100]  Order(RE64)PAGEID#1315-1316 (citing *Rombach*, 355 F.3d at 172)

[101]  Order(RE64)PAGEID#1315

4862-7670-6927.v1

in *Rombach*. *See* 355 F.3d at 172 (citing allegations "that the Registration statement was 'inaccurate *and* misleading;' that it contained '*untrue* statements of material facts;' and that 'materially *false* and *misleading* written statements' were issued") (emphasis in original).

That portion of *Rombach*'s analysis is deeply problematic. *Rombach* recognizes that "[f]raud is *not* an element or a requisite to a claim under Section 11 or Section 12(a)(2)." *Id.* at 171. Thus, the default rule is that Rule 8(a) applies to such claims, with Rule 9(b) being applicable *only* when the specific "conduct alleged" comprises "averments of fraud." *Id.*; *accord In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 631 (S.D.N.Y. 2007) ("Rule 9(b)'s standards apply to Section 11 claims only 'insofar as the claims are premised on allegations of fraud'"); *see also Nayani v. Lifestance Health Grp., Inc.*, 2023 U.S. Dist. LEXIS 78411, at *5-*6 (S.D.N.Y. May 4, 2023) ("'[To] hold that bare recitations of the elements of the [Securities Act] causes of action triggered Rule 9(b) would be contrary to the holding … in *Rombach* … that claims under Section 11 need not sound in fraud.'") (quoting *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 559 (S.D.N.Y. 2017) (first alteration in original)).

But *Rombach*'s analysis—and that of the district court—seemingly falls well short of this standard. *Rombach* suggested that allegations that statements were

- 35 -

"'inaccurate *and* misleading,'" and that offering documents "contained '*untrue* statements of material facts,'" and "'materially *false* and *misleading* written statements'" were somehow "classically associated with fraud."  355 F.3d at 172 (emphasis in original).  The district court similarly cites the Complaint's allegations that Timm's roadshow statements are "'misleading,'" and that the Registration Statement contains "'materially false and misleading statements and omissions,'" as well as statements and omissions that are "'inaccurate and misleading'" and "'untrue.'"[102]  But these purported "example[s]"[103] of the fraudulent *conduct* required to justify application of Rule 9(b), *see Rombach*, 355 F.3d at 171, are nothing more than the bare minimum required by the non-fraud statutes involved.

Section 11 *requires* "an *untrue* statement of a *material* fact or omitt[ing] to state a material fact required to be stated therein or *necessary to make the statements therein not misleading*."  15 U.S.C. §77k(a).  Thus, virtually every supposed "example"[104] of fraud identified by the district court—and every allegation cited in *Rombach*—is lifted directly from §11's statutory language.  This approach

---

[102] Order(RE64)PAGEID#1315-1316

[103] Order(RE64)PAGEID#1315-1316

[104] Order(RE64)PAGEID#1315-1316

contravenes *Rombach*'s recognition that fraud is *not* an element of a §11 claim and effectively holds that *every* §11 claim is subject to Rule 9(b)—not just ones in which the specific "conduct alleged" comprises "averments of fraud," *Rombach*, 355 F.3d at 171—because *every* §11 claim will allege statements and omissions that are untrue, misleading, and material. *See* 15 U.S.C. §77k(a). The same is true of §12(a)(2), which contains virtually identical language. *See* 15 U.S.C. §77l(a)(2).

Several courts have recognized the tension between *Rombach*'s recognition that "[f]raud is not an element or a requisite to a claim under Section 11 or Section 12(a)(2)," *Rombach*, 355 F.3d at 171, and its seeming conclusion that the bare elements of §11 and §12(a)(2) are "classically associated with fraud." *Id.* at 172. For instance, *Refco* observed that *Rombach*'s laundry list of generic §11 allegations "*presents something of a conundrum*, because applied literally, it would seem to require applying a 9(b) standard to all claims under §11…. *Fraud, of course, implies more than falsity*, and the mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently or innocently made) does not make it fraudulent." *Refco*, 503 F. Supp. 2d at 631-32; *accord Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 442-45 (S.D.N.Y. 2015); *Hoehl Fam. Found. v. Roberts*, 2020 U.S. Dist. LEXIS 258005, at *82-*83 (D. Vt. Oct. 15, 2020).

- 37 -

*Refco* resolved the "conundrum," 503 F. Supp. 2d at 631, by interpreting

*Rombach* as not rejecting its own analysis and thus not adopting an approach under

which Rule 9(b) is applicable in essentially every §§11 and 12(a)(2) case, but rather

requiring a case-by-case inquiry into the gravamen of the complaint in question.

> It is clear that the Second Circuit did not intend *Rombach* as an instruction that all §11 pleadings should be subjected to the Rule 9(b) standard. Nor can the Second Circuit have intended that all allegations directly reproducing the language of §11 be subject to Rule 9(b); as *Rombach* acknowledges, violations of §11 claims do not necessarily involve fraud. Therefore, the court's conclusion that the particular language in *Rombach* was indicative of fraud should be read in the context of the pleadings at issue in that case, in which the plaintiffs "[did] not assert any claim of negligence on the part of the Individual Defendants, nor [did] they specify any basis for such a claim." *Rombach* necessarily requires *a case-by-case analysis of particular pleadings to determine whether "the gravamen of the complaint is plainly fraud."*

*Refco*, 503 F. Supp. 2d at 632 (alterations in original); *accord Levy*, 103 F. Supp. 3d

at 442-445; *Hoehl*, 2020 U.S. Dist. LEXIS 258005, at *83-*84.

The Complaint makes clear that the gravamen of the §§11, 12(a)(2), and 15

claims here is negligence.[105] "Securities Act claims *do not sound in fraud if ordinary*

*negligence is expressly pled* in connection with those claims." *Suprema Specialties*,

438 F.3d at 272; *accord Streambend*, 781 F.3d at 1012 (observing that *Suprema*

---

[105] Complaint(RE31)PAGEID#744, 747, 759, 767(¶¶105, 112, 158, 171)

4862-7670-6927.v1

*Specialties* takes a "sound approach" to Rule 9(b) issues); *Woori Bank v. RBS Sec., Inc.*, 910 F. Supp. 2d 697, 705 (S.D.N.Y. 2012) ("If ordinary negligence is alleged and those claims [are] pled separately from the fraud claims, there is no compelling reason to trigger Rule 9(b)."); *New Jersey v. Sprint Corp.*, 531 F. Supp. 2d 1273, 1285 (D. Kan. 2008) (following *Suprema Specialties* and observing that "[t]here is no indication in … cases [such as *Rombach*] that the plaintiffs included any allegations of negligence in support of their Securities Act claims").

Here, negligence *is* "expressly pled," *Suprema Specialties*, 438 F.3d at 272,[106] and therefore the Complaint's Securities Act claims "do not sound in fraud." *See id.*

Because the district court here failed to analyze the gravamen of the Complaint—it merely relied upon generic allegations that would appear in every case involving §§11 and 12(a)(2) claims[107]—this Court should either reverse the lower court's Rule 9(b) analysis as Plaintiff's §§11, 12(a)(2), and 15 claims are plainly based upon strict liability and negligence, not fraud,[108] or, alternatively, this

---

[106] Complaint(RE31)PAGEID#744, 747, 759, 767(¶¶105, 112, 158, 171)

[107] Order(RE64)PAGEID#1315-1316

[108] Complaint(RE31)PAGEID#744, 747, 759, 767(¶¶105, 112, 158, 171)

- 39 -

Court should remand for the lower court to undertake that analysis in the first instance.

The district court also relied upon the Complaint's allegations that "Defendants operated a 'fraudulent scheme.'"[109] The referenced scheme allegations, however, relate *only* to Plaintiff's former Exchange Act claims—they are not included in the §§11, 12(a)(2), and 15 claims at issue in this appeal, which allege only strict liability and negligence.[110]  Indeed, Plaintiff affirmatively disavowed fraud as to those Securities Act claims.[111]  But more importantly, in this appeal Plaintiff has abandoned the Exchange Act allegations cited by the district court.[112] Accordingly, those allegations provide no basis for importing allegations of fraud into claims based solely on strict liability and negligence.[113]

---

[109] Order(RE64)PAGEID#1315-1316

[110] Complaint(RE31)PAGEID#764, 766(¶¶187, 194)

[111] Complaint(RE31)PAGEID#758, 760, 763(¶¶154, 165, 178)

[112] Plaintiff has also abandoned claims affirmatively based on Timm's roadshow statements.

[113] In *Ind. State Dist. Council v. Omnicare, Inc.*, 719 F.3d 498, 502 (6th Cir. 2013), *vacated*, *Omnicare*, 575 U.S. 175, this Court rejected an argument based "primarily on a disclaimer" of fraud, but that decision was vacated by the Supreme Court, and, regardless, is irrelevant because there the §11 claims *were* based upon fraudulent

- 40 -

Even if the Exchange Act claims had not been abandoned, there still is no basis for attributing fraud to §§11, 12(a)(2), and 15 claims that *contain no allegations of fraud*. "[W]here, as here, individual defendants are accused in separate claims of the same complaint of having violated Section 11, Section 12(a)(2), and Section 10(b), *the Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims*. In such a case, the fraud allegations cannot be said to 'contaminate' the Section 11 and Section 12(a)(2) claims if the allegations are pled separately." *Suprema Specialties*, 438 F.3d at 272-73; *accord Streambend*, 781 F.3d at 1011-12. Thus, the district court's reliance on fraud allegations not incorporated into the §§11, 12(a)(2), and 15 claims in order to justify application of Rule 9(b) was error.

Regardless, Plaintiff has sufficiently alleged Securities Act claims under any pleading standard because the Complaint details the precise "time, place and contents of the misrepresentations" made in connection with the IPO. *See In re Regions Morgan Keegan Sec., Derivative, & ERISA Litig.*, 743 F. Supp. 2d 744, 759-60 (W.D. Tenn. 2010) (finding Securities Act claims satisfied Rule 9(b) because the plaintiff identified the material misrepresentations, stated when they were made, and

---

conduct—the GAAP violations. *See Omnicare*, 583 F.3d at 948. The same is not true here.

explained why the statements were misleading) (citing *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)).  Moreover, the district court's Order identifies no issue in which the 9(b) standard was dispositive.  Thus, even if this Court disagrees with the preceding Rule 9(b) analysis, Plaintiff should prevail regardless of the applicable standard.

    **3.**    **Defendants' statement that its mobile-directed customer-acquisition strategy was "delivering customer acquisition costs below the average cost of doing so" was false and misleading because it was not doing so at the time of the IPO.**

    **a.**    **The statement was false and misleading.**

The Registration Statement emphasized Root's ability to exploit the mobile-device channel, observing that it "is the fastest growing retail channel in the United States" and explaining that "[w]e therefore designed a mobile-directed customer acquisition strategy, *delivering customer acquisition costs below the average cost of doing so* through each of the direct and agent channels."[114]  But that statement was false and misleading.  In fact, when Defendants spoke, Root's customer-acquisition strategy was *not* "delivering customer acquisition costs below the average cost"— Root's CAC had spiked to over $500 during the third fiscal quarter of 2020, meaning

---

[114] Complaint(RE31)PAGEID#744-745(¶106)

that as of the date of the IPO Root was performing like a typical insurer, not one that enjoyed a competitive advantage as to CAC.[115]

The district court disagreed, reasoning that the statement related only to "Root's past performance" and "unambiguously provides that Root '*designed*' a mobile-centric customer generating strategy that was 'delivering' CAC superior to the average CAC associated with 'direct and agent channels.'"[116]  With all due respect, the district court's analysis is internally contradictory.  It is true that Defendants' statement indicates that the *design* of Root's mobile-directed customer-acquisition strategy had been completed in the past—"we therefore design*ed* a mobile-directed customer acquisition strategy."[117]  But the district court went on to say that the statement indicates that the previously-designed strategy "*was* '*delivering*' CAC superior to the average CAC associated with 'direct and agent channels.'"[118]

---

[115] Complaint(RE31)PAGEID#726, 739, 741-742, 744-745, 752-755(¶¶7-8, 80, 94, 106, 131-135)

[116] Order(RE64)PAGEID#1324 (emphasis in original)

[117] Complaint(RE31)PAGEID#744-745(¶106)

[118] Order(RE64)PAGEID#1324 (emphasis in original)

- 43 -

But it wasn't delivering that superior performance—as of the time of the IPO the performance it was delivering was no better than that of the typical insurer, a situation highly likely to worsen in light of the 50-state investment strategy Root was implementing.[119]  The statement's use of the term "delivering" is indicative of present activity, *i.e.*, that the strategy was *at the time of the IPO* delivering "superior" CAC performance.  The language of the district court's Order seems to embrace that reading—it states "Root '*designed*' a mobile-centric customer generating strategy *that was* '*delivering*' CAC superior to the average CAC"—but the court does not grapple with the consequence of its (entirely proper) present-tense reading of the term "delivering."   That present-tense reading compels the conclusion that the district court's own reasoning demonstrates that it erred.

Moreover, "whether [Defendants'] statement is 'misleading' depends on the perspective of a reasonable investor," *Omnicare*, 575 U.S. at 186, and a reasonable investor—or "reasonable juror" as this Court put it in *Bridgestone*, 399 F.3d at 672—could easily conclude that Defendants' statement patting themselves on the back for designing a strategy "delivering customer acquisition costs below the average cost

---

[119] Complaint(RE31)PAGEID#725-726,  739,  741-742,  744-746,  752-755(¶¶7-9, 80, 94, 106-108, 131-135)

- 44 -

of doing so through each of the direct and agent channels"[120] conveyed that the strategy *actually was* delivering customer-acquisition costs below the average cost of doing so through each of the direct and agent channels.  It wasn't as of the time of the IPO and the statement was therefore false.

> **b.    Having raised the issue of their CAC, Defendants failed "to speak fully and truthfully" about it by not disclosing that as of the IPO Root's CAC was actually no different from the typical insurer's CAC.**

> ### (1)    The misleading omission.

Alternatively, having spoken in the Registration Statement to their strategy's ability to deliver CAC below the industry-average CAC—and thus to confer a competitive advantage on Root—Defendants "disclose[d] material facts in connection with securities transactions" and therefore "'assume[d] a duty to speak fully and truthfully on those subjects.'"   *Helwig*, 251 F.3d at 561; *accord Bridgestone*, 399 F.3d at 670.  By failing to disclose that as of the time of the IPO that the strategy was not working, and that CAC was skyrocketing, Defendants violated the duty set forth in *Helwig* and *Bridgestone*.

---

[120] Complaint(RE31)PAGEID#744-745(¶106)

Indeed, both §§11 and 12(a)(2) permit omissions-based liability. Section 11 provides for liability when a Registration Statement "omit[s] to state a material fact … necessary to make the statements therein not misleading." 15 U.S.C. §77k(a). Section 12(a)(2) similarly provides for liability when "a prospectus or oral communication … omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. §77l(a)(2).

Here, by celebrating a purportedly successful "mobile-directed customer acquisition strategy" that was "delivering customer acquisition costs below the average cost of doing so through each of the direct and agent channels,"[121] while not disclosing that it was *not* delivering low CAC as of the IPO, Defendants "misle[d] investors by saying one thing and holding back another." *Omnicare*, 575 U.S. at 192. Indeed, given that Root's deteriorating CAC performance—it was already no better than the typical insurer and Root's competitive advantage had thus evaporated[122]—was highly likely to worsen in light of the 50-state strategy in which

---

[121] Complaint(RE31)PAGEID#744-745(¶106)

[122] Complaint(RE31)PAGEID#725-726, 739, 741-742, 744-746, 752-755(¶¶7-9, 80, 94, 106-108, 131-135)

Root was investing,[123] Defendants plainly did not "'speak fully and truthfully on [the] subject[]'" of Root's CAC, *see Helwig*, 251 F.3d at 561, when they informed investors that Root's strategy was "delivering customer acquisition costs below the average cost of doing so through each of the direct and agent channels"[124] without disclosing that Root's CAC then exceeded $500.[125]  Defendants thus failed to disclose material facts that were necessary to make the statements in the Registration Statement not misleading.

### (2)    The district court's omissions analysis is mistaken.

In addition to mischaracterizing Defendants' statement that Root was "'delivering customer acquisition costs below the average cost of doing so,'"[126] the district court provided several additional reasons for rejecting Plaintiff's omissions theories.[127]  All are erroneous.

---

[123] Complaint(RE31)PAGEID#726, 740, 745-746(¶¶9-10, 89, 108)

[124] Complaint(RE31)PAGEID#744-745(¶106)

[125] Complaint(RE31)PAGEID#727, 741-742, 752-755(¶¶15, 94-95, 131-135)

[126] Order(RE64)PAGEID#1323-1324

[127] Order(RE64)PAGEID#1336-1339

First, the court simply denied that there was a disclosure duty because Defendants had truthfully disclosed favorable information about Root's CAC between August 2018 and August 2020—it was $332 compared to over $500 as of the time of the IPO[128]—and that the as-of-the-IPO increase was immaterial.[129] But Plaintiff contends it was Defendants' creation of the misleading impression that Root's strategy was then *presently* delivering favorable CAC performance that gave rise to a duty to be truthful and complete under *Helwig* and *Bridgestone*, not their reports of their performance up to August 2020. The district court's analysis of the past-performance statements was thus irrelevant.

Moreover, the court's suggestion that the dramatic increase in Root's crucial—and oft-touted—CAC metric was immaterial ignores both well-settled authority establishing that materiality is a jury question that is only rarely appropriately resolved at the motion-to-dismiss stage and the centrality of the CAC metric to Root's business and investors.

"The [materiality] determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the

---

[128] Complaint(RE31)PAGEID#725-726, 741-742, 752-755(¶¶7-8, 94, 131-135)

[129] Order(RE64)PAGEID#1329

- 48 -

significance of those inferences to him, and *these assessments are peculiarly ones for the trier of fact*." *TSC Indus. v. Northway*, 426 U.S. 438, 450 (1976).[130] "[W]hether or not a statement is material turns on 'a fact-intensive test,'" and "'"depends on the significance the reasonable investor would place on the withheld or misrepresented information."'" *Bridgestone*, 399 F.3d at 669; *see also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716-17 (2d Cir. 2011) ("Materiality is an 'inherently fact-specific finding.'") (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 236 (1988)). Courts ask "would the information, had it been presented accurately, have '"significantly altered the 'total mix' of information made available?"'" *Bridgestone*, 399 F.3d at 669.

Ultimately, the question is "was [the dramatic increase in CAC as of the IPO] '"*so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] unimportance*?"'" *Id.* at 679 (emphasis and second alteration in original). While the district court generally stated the appropriate standard—noting "'the reasonable investor'" and "'"total mix of information"'"

---

[130] Because the omitted information concerned facts regarding Root's CAC as of the time of the IPO, it is considered to be "'hard information.'" *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014).

standards[131]—it did not acknowledge the substantial burden to demonstrate "'"obvious[] unimportan[ce]"'" that must be met to justify dismissal on materiality grounds at the pleading stage. *See Bridgestone*, 399 F.3d at 669, 679.

There is little doubt that under these standards that Plaintiff has adequately pleaded materiality. The Complaint's allegations—presumed true and "'construed in the plaintiff's favor,'" at this stage, *Helwig*, 251 F.3d at 553—together offer a compelling showing of the over-arching materiality of Root's CAC.[132] CAC is "one of the *most important* measures of profitability" for a growth-phase company like Root, and the Registration Statement missed no opportunities to emphasize that CAC comprised an area of competitive advantage for Root, which had maintained a well-below-average CAC of $332 for the period of August 2018 to August 2020.[133] Indeed, Root emphasized that CAC was one of Root's four "principal profitability levers."[134] Defendants thus gave investors the impression that CAC comprised a

---

[131] Order(RE64)PAGEID#1317

[132] Complaint(RE31)PAGEID#737-739(¶¶73-86)

[133] Complaint(RE31)PAGEID#725-726, 738-739(¶¶6-8, 75-80)

[134] Complaint(RE31)PAGEID#738(¶76)

powerful competitive advantage for Root—an advantage that was supposedly based upon Root's successful data-driven marketing efforts.[135]

Investors and analysts were keenly focused on Root's CAC prior to the IPO, as reflected in multiple pre-IPO articles discussing Root's $332 CAC.[136]  Moreover, Defendant Rosenthal jokingly—but tellingly—confirmed the over-arching materiality of Root's CAC during Root's first earnings call as a public company by stating that "although this is our first earnings call, I have a feeling *that wouldn't be an earnings call without a question from you on CAC.*"[137]  CAC is thus so crucial to evaluation of Root's business that acute analyst interest in it is a given.

Under these circumstances, a reasonable investor would perceive a sharp increase in CAC to "have "'significantly altered the 'total mix' of information made available.""" *Bridgestone*, 399 F.3d at 669.  Root itself emphasized its CAC and analysts confirmed that metric's centrality.  *See Dirks v. SEC*, 463 U.S. 646, 658-659 (1983) ("It is commonplace for analysts to 'ferret out and analyze information'").  Moreover, Root's CAC inflation was virtually certain to be of great

---

[135] Complaint(RE31)PAGEID#734, 740(¶¶48, 87-88)

[136] Complaint(RE31)PAGEID#739(¶¶81-85)

[137] Complaint(RE31)PAGEID#754-755(¶135)

4862-7670-6927.v1

interest to investors because of Root's plans for further investment designed to build a national brand.[138]   Thus, investors would certainly pause when informed that Root's CAC was *already inflated* with further investment in a national-advertising campaign—with concomitant CAC increases—certain to come.[139]   That Root's CAC was already skyrocketing upward was not """"so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] unimportance.""""  *Bridgestone*, 399 F.3d at 679 (emphasis omitted).

Second, the district court held that Timm updated investors as to the CAC increases at in his roadshow comments.[140]   Timm's comments are irrelevant to whether the Registration Statement was misleading.   Indeed, the Registration Statement informed investors that they should rely only on the Registration Statement itself.[141]

And, in any event, Timm misleadingly insisted that—despite a fiscal quarter of disappointing CAC results—that "[o]ur customer acquisition cost has maintained

---

[138] Complaint(RE31)PAGEID#740(¶89)

[139] Complaint(RE31)PAGEID#740(¶89)

[140] Order(RE64)PAGEID#1337-1338

[141] Complaint(RE31)PAGEID#736(¶¶62-63)

- 52 -

well below the direct average and so we really are more competitive," and described "the recent [CAC] spike" as an insignificant "short term" phenomenon resulting from "experimentation on brand."[142]   Whether Timm's internally contradictory statements could enlighten any investor plainly poses a factual question that cannot be resolved at the this stage under the ""so obviously unimportant to a reasonable investor"" test.  *See Bridgestone*, 399 F.3d at 679 (emphasis omitted).  Nor was there any basis for claiming CAC increases were "short term"—Root was "launch[ing] a national advertising campaign to build [its] brand awareness"— hardly a short-term endeavor.[143]

Nor is there any legal basis for the district court's reliance on the roadshow statements to supply information omitted from the Registration Statement—the district court overlooked the fact that "'[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a ... prospectus on the basis that the information is public knowledge and otherwise available to them.'"  *N.J. Carpenters Health Fund*

---

[142] Complaint(RE31)PAGEID#750(¶124)

[143] Complaint(RE31)PAGEID#745-746(¶108)

- 53 -

4862-7670-6927.v1

*v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 127 (2d Cir. 2013) (alterations in original).

Indeed, principles of statutory construction demonstrate that the structure of §11 precludes any effort to impute knowledge of omitted facts to investors:

> The '33 Act itself implicitly limits the impact of public information on materiality determinations. Section 11 creates an affirmative defense where a defendant can prove that "at the time of ... acquisition," the purchaser "knew" of the alleged "untruth or omission." 15 U.S.C. §77k(a).… If courts held that merely available, as opposed to widely known, public information exposed an untruth or omission, thereby rendering it immaterial, they would effectively shift the burden of proof on §11's affirmative defense, presuming that the plaintiff *should* have known the relevant information rather than requiring the defendant to prove actual knowledge.

*Id.* at 127 n.12 (emphasis in original).

The district court committed the very error identified in *N.J. Carpenters*: it relieved Defendants of the burden to prove that investors were aware of Timm's roadshow remarks—*and* somehow understood them to reveal, rather than obscure, Root's deteriorating CAC performance—*and* "presum[ed] that the plaintiff *should* have known the relevant information rather than requiring [Defendants] to prove actual knowledge." *See id.*; *see also* 15 U.S.C. §77k(a) (imposing liability for false statements and omissions "unless it is proved that at the time of such acquisition he knew of such untruth or omission").

- 54 -

Relatedly, "Section 12(a)(2) requires the plaintiff to prove that it did not [have actual knowledge] of the material misstatement in the prospectus." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 122 (2d Cir. 2017).  While circumstantial evidence is relevant to actual knowledge, that does not mean that constructive knowledge suffices.  *See id.*  Rather, "[t]he mere '*[a]vailability* elsewhere of truthful information cannot excuse untruths or misleading omissions in the prospectus.'  A plaintiff is entitled to recover under Section 12 if it was genuinely unaware of the falsity no matter how easily accessible the truth may have been." *Id.* (emphasis in original).

The Complaint pleads that Plaintiff did not and could not have known of the misstatements and omissions in the Registration Statement at the time it acquired its Root shares.[144]  Whether Timm's misleading and inconsistent statements regarding Root's CAC can somehow establish Plaintiff's actual knowledge of the true state of Root's CAC as of the IPO is plainly a factual question that is not properly resolved at this stage.

Third, the court noted that "the Registration Statement also warned investors that Root was engaging in a national marketing campaign that *could* result in

---

[144] Complaint(RE31)PAGEID#762(¶173)

4862-7670-6927.v1

elevated CAC in the long term," but that purported warning was utterly ineffectual—it did not reveal that that Root's CAC was *already* elevated as of the IPO.[145] "'To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.'" *Rubinstein*, 20 F.3d at 171; *accord infra* at 65-69 (arguing that Root's purported risk warning is itself actionable). Defendants' purported risk warning was misleading and cannot excuse their misleading omissions.

The district court's last two justifications for Defendants' omissions are even more tenuous. Its fourth argument suggests that the Complaint does not "allege any facts suggesting that Root no longer had a competitive CAC as compared to other channels as of the IPO."[146] The court reasoned that the Complaint's allegations relate "exclusively to Root's short-term increase in its own CAC due to the nationwide marketing campaign; the [Complaint] is silent as to whether this elevated CAC eliminated Root's advantage as to other channels as of the IPO."[147] This Defendant-friendly speculation runs afoul of the court's obligation to "'construe the

---

[145] Order(RE64)PAGEID#1337-1338; Complaint(RE31)PAGEID#727, 741-742, 752-755(¶¶15, 94, 131-135)

[146] Order(RE64)PAGEID#1338

[147] Order(RE64)PAGEID#1338 (emphasis omitted)

- 56 -

complaint in a light most favorable to the plaintiff, and … [w]hen an allegation is capable of more than one inference, it must be construed [by the court] in the plaintiff's favor.'" *Helwig*, 251 F.3d at 553.

Moreover, Defendants portrayed Root's CAC as a competitive advantage in a unitary sense—it informed investors that its strategy was "delivering customer acquisition costs below the average cost of doing so *through each of the direct and agent channels*"[148] without disclosing that Root's CAC was then no better than that of the average company.[149]  And even if Defendants' CAC were broken down on a channel-by-channel basis, Defendants cannot conceal its materially poor CAC performance by somehow aggregating results as to other (unidentified) channels as the district court's entirely speculative analysis posits.  *Cf. Litwin*, 634 F.3d at 719 (a company "is not permitted, in assessing materiality, to aggregate negative and positive effects on its performance fees in order to avoid disclosure of a particular material negative event").

Finally, the court reasoned that "Plaintiff fails to allege any facts that Root's short-term increase in CAC meant that it could not, in the long term, maintain

---

[148] Complaint(RE31)PAGEID#744-745(¶106)

[149] Complaint(RE31)PAGEID#725-726, 739, 741-742, 744-746, 752-755(¶¶7-9, 80, 94, 106-108, 131-135)

- 57 -

competitively low CAC."[150]  That reasoning suggests that it is permissible to mislead investors as to Root's elevated CAC as of the time of the IPO so long as it possible that Root may achieve a competitive CAC sometime in the future.

But this Court has explained that "'"the fundamental purpose of the [Securities] Act [is] implementing a philosophy of full disclosure,"'" and "'to substitute a philosophy of full disclosure for the philosophy of caveat emptor.'" *Bridgestone*, 399 F.3d at 668.  Accordingly, the Complaint need not plead facts suggesting that Root could never regain its competitive advantage as to CAC in the future as a predicate for seeking redress for Defendants' misleading omissions regarding its CAC as of the date of the IPO—Defendants violated their duty of "'"full disclosure."'"  *Id.*  Moreover, "[t]he law assesses the materiality of a misrepresentation *at the time it is made*, not after intervening events or remedial action have rendered it harmless."  *SEC v. Reyes*, 491 F. Supp. 2d 906, 909-910 (N.D. Cal. 2007).

Investors were entitled to decide for themselves whether they wished to bet on Root's ability to recover its competitive advantage despite its current poor CAC performance coupled with Root's plans for a no-doubt expensive national-brand-

---

[150] Order(RE64)PAGEID#1338 (emphasis omitted)

- 58 -

building campaign.[151]  Defendants denied them that opportunity and are therefore liable. *See Meyer*, 761 F.3d at 251 ("the failure to disclose then-ongoing and serious [problems] would cause a reasonable investor to make an overly optimistic assessment of the risk").

### 4. Defendants' present-tense statement that Root's "strategy has resulted in a cost of acquisition advantage" was false and misleading at the time.

#### a. The statement was false when made.

The Registration Statement stated that "[t]he efficiency of our customer acquisition strategy has resulted in a cost of acquisition advantage versus direct and agent channels."[152]  That statement—employing "the present-tense [verb] 'has'" rather than "the past-tense verb 'had,'" *see Barton*, 100 F.3d at 45—was an unambiguous declaration that Root's customer-acquisition strategy was then *presently* providing "a cost of acquisition advantage versus direct and agent channels."[153]  That wasn't true—as of the date of the IPO, Root's CAC was no better

---

[151] Complaint(RE31)PAGEID#726-727, 740, 745-746, 752-755(¶¶9, 15, 89, 94, 108, 131-135)

[152] Complaint(RE31)PAGEID#744-745(¶106)

[153] Complaint(RE31)PAGEID#744-745(¶106)

- 59 -

than that of the typical insurer.[154]   Its customer-acquisition strategy was not producing the claimed results, and, due to Root's national advertising campaign, it was highly unlikely that it would do so in the future.[155]   "[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor," *Omnicare*, 575 U.S. at 186, and because "a reasonable investor" could interpret Defendants' present-tense statement as (falsely) describing Root's then-present performance, the statement is actionable.

The district court—without ever addressing "the perspective of a reasonable investor," *Omnicare*, 575 U.S. at 186—disagreed.   The district court viewed Defendants' statement as implicating the duty to update.[156]   It is mistaken.   "The duty to update 'concerns statements that, although reasonable at the time made, *become misleading when viewed in the context of subsequent events*.'"   *Helwig*, 251 F.3d at 561 n.6.   Thus, a plaintiff need only rely on a duty-to-update theory when a statement was "'reasonable at the time made,'" and later became "'misleading when

---

[154] Complaint(RE31)PAGEID#725-727, 739, 741-742, 752-755(¶¶7, 10, 15, 80, 94-95, 131-135)

[155] Complaint(RE31)PAGEID#726, 740-742, 745-746, 752-754(¶¶9-10, 89, 94-96, 108, 131-134)

[156] Order(RE64)PAGEID#1325

4862-7670-6927.v1

viewed in the context of subsequent events.'" *Id.* But where, as here, a statement is "misleading not only in light of later events *but also at the time [it was] made*," the duty to update is inapposite. *See id.* Defendants' statement was "misleading … at the time [it was] made," *id.*, because as of the date of the IPO, Root was not benefitting from "a cost of acquisition advantage versus direct and agent channels"—its CAC was no better than that of the typical insurer.[157]

The district court, however, somehow concluded that "this statement, which is *expressly* limited to a 24-month period, is not misleading."[158] The district court's analysis is perplexing—the statement that "[t]he efficiency of our customer acquisition strategy has resulted in a cost of acquisition advantage versus direct and agent channels"[159] contains no "express[]" (or implied) temporal limitation, let alone an "express[]" limitation to a 24-month period.[160] Indeed, if Defendants had wanted to do so, they could easily have said "[t]he efficiency of our customer acquisition

---

[157] Complaint(RE31)PAGEID#725-727, 739, 741-742, 744-745, 752-755(¶¶7, 15, 80, 94, 106, 131-135)

[158] Order(RE64)PAGEID#1325

[159] Complaint(RE31)PAGEID#744-745(¶106)

[160] Order(RE64)PAGEID#1325

4862-7670-6927.v1

strategy ha[d] resulted in a cost of acquisition advantage versus direct and agent channels [for a 24-month period]."[161]  They didn't.

Because the statement plainly contains no express temporal limitation, the district court must have inferred it from Defendants' recitation of Root's past performance in the sentence following the challenged one.

> The efficiency of our customer acquisition strategy has resulted in a cost of acquisition advantage versus direct and agent channels. While our customer acquisition costs can vary by channel mix, by state or due to seasonality, over the period from August 2018 to August 2020 our average customer acquisition cost was $332.  In the near term, as we expand our licensed footprint to 50 states, we will invest in our national brand, which will increase awareness, build credibility and support all four of our distribution channels.[162]

Nothing in that second sentence suggests that it serves to limit the scope of its predecessor—indeed, the first sentence describes present performance, while its successor is focused on past performance, *i.e.*, "[what] our average customer acquisition cost *was*" in a two-year period ending weeks before the IPO.[163]

The district court was obligated to "'construe the complaint in a light most favorable to the plaintiff, and … [w]hen an allegation is capable of more than one

---

[161] Complaint(RE31)PAGEID#744-745(¶106)

[162] Complaint(RE31)PAGEID#744-745(¶106)

[163] Complaint(RE31)PAGEID#744-745(¶106)

4862-7670-6927.v1

inference, it *must* be construed in the plaintiff's favor.'" *Helwig*, 251 F.3d at 553.

A reasonable investor plainly could interpret Defendants' statements to: (1) in the

first sentence, describe present performance; and (2) in the second sentence, offer

supporting evidence of past performance in an effort to substantiate the first

sentence's claim of positive present performance.  But even assuming it is possible

to construe the second sentence to change the meaning of the first from describing

*present* performance with *present-tense* language to referring solely to past

performance ending weeks before the IPO was conducted, it was error for the district

court to choose that unlikely inference over the one favoring Plaintiff that it was

obligated to draw.  *See id.*  The statement is actionable.

> **b.    The statement is misleading because Defendants omitted the fact that there was no CAC advantage as of the date of the IPO.**

Because Defendants spoke in the Registration Statement about their strategy's

then-*present* ability to deliver CAC below the industry-average CAC and Root's

exceptionally low CAC—$332—over a two-year period from August 2018 to

August 2020, they "disclose[d] material facts in connection with securities

transactions" and therefore "'assume[d] a duty to speak fully and truthfully on those

subjects.'"  *Id.* at 561.  They did not satisfy that obligation, and thus are liable under

the omissions provisions of §§11 and 12(a)(2).

- 63 -

By combining their present-tense claims of a competitive advantage in CAC with a reference to Root's successful two-year run from August 2018 to August 2020, without also disclosing that that successful run had come to a screeching halt as of the IPO, Defendants "omitted to state a material fact … necessary to make the statements [in the Registration Statement] not misleading." 15 U.S.C. §77k(a). That was especially true in light of the facts that Root's CAC no longer comprised a competitive advantage, Root's CAC had dramatically increased to the extent that it was no better than that of the typical insurer, and the situation was highly likely to worsen in light of Root's national-advertising campaign.[164]  Defendants thus did not "'speak fully and truthfully on [the] subject[]'" of Root's CAC, *see Helwig*, 251 F.3d at 561, when it informed investors that its strategy was "delivering customer acquisition costs below the average cost of doing so through each of the direct and agent channels"[165] without disclosing that Root's CAC then exceeded $500.[166]

The district court's additional reasons for rejecting the Complaint's omissions allegations are without merit as previously explained.  *See supra* at 47-59.

---

[164] Complaint(RE31)PAGEID#725-726, 739, 741-742, 744-746, 752-755(¶¶7-9, 80, 94, 106-108, 131-135)

[165] Complaint(RE31)PAGEID#744-745(¶106)

[166] Complaint(RE31)PAGEID#739, 741-742, 752-755(¶¶80, 94, 131-135)

4862-7670-6927.v1

### 5. Because the risk had already materialized, Root's CAC risk warning was misleading and actionable.

Defendants included a purported risk warning in the Registration Statement, stating that "[a]s we grow, *we may struggle* to maintain cost-effective marketing strategies, and our customer acquisition costs *could rise substantially*."[167] But "'[t]o warn that the untoward *may* occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.'" *Rubinstein*, 20 F.3d at 171; *accord Alphabet*, 1 F.4th at 703; *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996)); *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 2022 U.S. Dist. LEXIS 59854, at *91-*92 (W.D. Tenn. Mar. 31, 2022); *Zwick Partners, LP v. Quorum Health Corp.*, 2018 U.S. Dist. LEXIS 97942, at *21 (M.D. Tenn. Apr. 19, 2018); *see also Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Such risk warnings—referring to only the possibility of a negative result sometime in the future—effectively imply that no such negative result has already

---

[167] Complaint(RE31)PAGEID#746(¶110)

4862-7670-6927.v1

occurred or omit the material fact that such results *have* already occurred.[168]  That is

why the courts have repeatedly condemned such warnings as misleading.  *See, e.g.*,

*Rubinstein*, 20 F.3d at 171; *see also Shaw*, 537 F.3d at 541-42 (a statement is

misleading when it "'affirmatively create[s] an impression of a state of affairs that

differs in a material way from the one that actually exists'").  Indeed, courts have

repeatedly relied on these principles to find that sham risk warnings—like the one

issued here—that purport to warn of material risks that have already materialized

without disclosing that the risks have transpired are misleading and actionable.  *See,*

*e.g.*, *Hurwitz v. LRR Energy, L.P.*, 241 F. Supp. 3d 491, 504-05 (D. Del. 2017); *In*

*re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516, 518

(S.D.N.Y. 2013); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d

388, 400 (S.D.N.Y. 2005).

    In short, "the failure to disclose then-ongoing and serious [problems] would

cause a reasonable investor to make an overly optimistic assessment of the risk.  *A*

*generic warning of a risk will not suffice when undisclosed facts on the ground would*

---

[168] Thus, the supposed risk warning is not "a forward-looking statement concerning Root's future CAC," or "a prediction about Root's future," as the district court suggested.   Order(RE64)PAGEID#1329.   Again, the district court's additional reasons for rejecting the Complaint's omissions allegations are meritless.  *See supra* at 47-59.

*substantially affect a reasonable investor's calculations of probability*." *See Meyer*, 761 F.3d at 251. Defendants' warning here is exactly what *Meyer* condemned. They issued a "generic warning," *id.*, that "[a]s we grow, *we may* struggle to maintain cost-effective marketing strategies, and our customer acquisition costs *could rise* substantially,"[169] when Root's CAC had already risen prior to the IPO to a level associated with the typical insurer.[170] Defendants thus caused investors to undertake an "overly optimistic assessment of the risk" that Root's competitive advantage in CAC might not survive Root's national advertising campaign. *See Meyer*, 761 F.3d at 251. Defendants' purported warning was therefore plainly misleading and actionable, as multiple courts have held. *See, e.g.*, *Rubinstein*, 20 F.3d at 171.

Relatedly, multiple courts have recognized that warning that a risk may occur when in fact it had already materialized is so misleading that it may not serve to render harmless misleading forward-looking statements under the bespeaks-caution doctrine. As the Second Circuit colorfully put it, "'[t]he doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the

---

[169] Complaint(RE31)PAGEID#746(¶110)

[170] Complaint(RE31)PAGEID#725-727, 739, 741-742, 752-755(¶¶7, 15, 80, 94, 131-135)

- 67 -

Grand Canyon lies one foot away.'" *Rombach*, 355 F.3d at 173; *accord In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 103 (D.C. Cir. 2015).

The district court here simply failed to recognize that "there is an important difference between warning that something '*might*' occur and that something '*actually* had' occurred." *Harman*, 791 F.3d at 103 (emphasis in original); *accord Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011). Such purported cautionary language is plainly "misleading." *Harman*, 791 F.3d at 108.

Indeed, the purpose of cautionary language is to "warn[] investors that bad things may come to pass" in order to aid them "in dealing with the contingent or unforeseen future." *P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004). But "*present fact*—knowledge [that is] within the grasp of the offeror—is a different matter. Such facts exist and are known; they are not unforeseen or contingent. It would be perverse indeed if an offeror could knowingly misrepresent historical [or present] facts but at the same time disclaim those misrepresented facts with cautionary language." *Id.*; *see also Harman*, 791 F.3d at 101 (observing that to be useful, warnings must be "tailored to a particular company's status *at a particular time*" and disapproving "cautionary statements that are too temporally general").

The district court's sole rejoinder to this solid wall of authority is a citation to a single 27-year-old district court decision from the Northern District of California,

*Zeid*, 930 F. Supp. at 437.[171]  It further rejected cases cited by Plaintiff—such as *Facebook*, 986 F. Supp. 2d 487—as "out-of-circuit" despite acknowledging that they "are factually similar."[172]  *Zeid*, of course, is also an out-of-circuit case.

But the flaws in the district court's reliance on *Zeid* are not limited to geography.  First, *Zeid* contains no relevant analysis, cites none of the authorities addressed above, and simply rejects the plaintiff's argument as "absurd."  *See* 930 F. Supp. at 437.  But the argument was not so absurd—a host of Ninth Circuit opinions have flatly rejected *Zeid*'s approach.  *See Alphabet*, 1 F.4th at 703-04 (observing that "[r]isk disclosures that 'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' *can mislead reasonable investors*" and collecting post-*Zeid* Ninth Circuit cases) (alterations in original).  In short, *Zeid* is utterly unpersuasive and the district court's *Zeid*-based analysis should be rejected.

---

[171] Order(RE64)PAGEID#1329

[172] Order(RE64)PAGEID#1329-1330

4862-7670-6927.v1

### C.    The District Court Erred in Dismissing the §15 Claim

The Complaint alleges a §15 control-person claim against Root and the Individual Defendants.[173]  Such a claim "grounds liability of control persons on the corporation being found liable under Section 11 or 12." *J&R*, 549 F.3d at 398.  The court dismissed the §15 claim because there was no primary violation under §§11 or 12(a)(2).[174]  Because the foregoing demonstrates that the Complaint's §§11 and 12(a)(2) claims are viable, this Court should reverse the dismissal of the §15 claim.

## VII.  CONCLUSION

On the basis of the foregoing, this Court should reverse as to the §11, §12(a)(2), and §15 claims.

DATED:  July 12, 2023                    Respectfully submitted,

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        STEVEN F. HUBACHEK
                                        JONAH H. GOLDSTEIN


                                            *s/Steven F. Hubachek*
                                        STEVEN F. HUBACHEK

---

[173] Complaint(RE31)PAGEID#763-764(¶¶177-184)

[174] Order(RE64)PAGEID#1352-1353

- 70 -

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
shubachek@rgrdlaw.com
jonahg@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
MICHAEL G. CAPECI
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
mcapeci@rgrdlaw.com

MURRAY MURPHY MOUL + BASIL
LLP
JOSEPH F. MURRAY
1114 Dublin Road
Columbus, OH 43215
Telephone:  614/488-0400
614/488-0401 (fax)
murray@mmmb.com

*Attorneys for Plaintiff-Appellant*

## RULE 32(g) CERTIFICATE

The undersigned counsel certified that PLAINTIFF-APPELLANT'S OPENING BRIEF uses a proportionally spaced Times New Roman typeface, 14-point, and that the text of the brief comprises 12,930 words according to the word count provided by Microsoft Word 2016 word processing software.

*s/Steven F. Hubachek*
STEVEN F. HUBACHEK

4862-7670-6927.v1

## DECLARATION OF SERVICE

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.      I hereby certify that on July 12, 2023, I electronically filed the foregoing document: PLAINTIFF-APPELLANT'S OPENING BRIEF with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.

3.      I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 12, 2023, at San Diego, California.

*s/Steven F. Hubachek*
_____
STEVEN F. HUBACHEK

4862-7670-6927.v1

**ADDENDUM**

**PLAINTIFF-APPELLANT'S DESIGNATION OF
RELEVANT DISTRICT COURT DOCUMENTS**

Plaintiff-Appellant hereby designates the following district court documents pursuant to 6 Cir. R. 30(g).

| RECORD ENTRY | DESCRIPTION | PAGE ID NUMBER RANGE |
|---|---|---|
| RE1 | Complaint for Violations of the Federal Securities Laws, filed March 19, 2021. | PageID# 1-34 |
| RE31 | Amended Complaint for Violations of the Federal Securities Laws, filed November 19, 2021. | PageID# 723-789 |
| RE57 | Defendants' Motion to Dismiss the Amended Complaint, filed May 20, 2022. | PageID# 891-1185 |
| RE58 | Plaintiff's Opposition to Defendants' Motion to Dismiss the Amended Complaint, filed July 1, 2022. | PageID# 1186-1250 |
| RE60 | Defendants' Reply Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint, filed August 1, 2022. | PageID# 1252-1299 |
| RE64 | Opinion and Order, filed March 31, 2023. | PageID# 1305-1353 |
| RE65 | Judgment in a Civil Case, filed March 31, 2023. | PageID# 1354 |
| RE66 | Notice of Appeal, filed April 28, 2023. | PageID# 1355-1356 |

4862-7670-6927.v1